The next case on the call of the docket is agenda number 8, number 125150. Susan Steed v. Rezin Orthopedics and Sports Medicine, S.C. Mr. Grand, as soon as you're ready, then you may proceed. Do you have a cover for the microphone? Thank you, Your Honor. Karen D. Grand, good morning, Your Honors. Appearing on behalf of the appellant, Rezin Orthopedics and Sports Medicine, S.C., may it please the Court, counsel. The appellate court fundamentally erred in holding that expert testimony concerning the clinic's compliance with the standard of care was irrelevant to the claim against Rezin. The appellate court conflated the duty owed by an employee to follow her employer's instructions with Rezin Orthopedics' duty to provide its patient with health care comporting with the applicable standard of care. The proper perspective for reviewing the appellate decision and the events in the trial court are framed by plaintiff's allegations, plaintiff's expert testimony through Dr. Jimenez, and the court's instructions to the jury, which plaintiff did not challenge on appeal in the appellate court or in this court. In the Fourth Amendment complaint, plaintiff alleged Rezin failed to act as a reasonably careful clinic. That is, plaintiff alleged a claim of institutional negligence in monitoring the patient, scheduling a follow-up visit, communicating with the plaintiff, and advising the plaintiff. There was a Section 2622 report with a medical negligence complaint against both Dr. Tracy and the clinic. Fast-forward through discovery to trial, plaintiff's expert witness, Dr. Jimenez, an orthopedic surgeon, voiced plaintiff's processional negligence theory against Dr. Tracy and an institutional negligence theory against Rezin Orthopedics. As to Rezin, Dr. Jimenez testified, to a reasonable degree of medical and surgical certainty, that's a quote, that the standard of care required Rezin Orthopedics to set an appointment in the two-week time frame set by Dr. Tracy. The basis for Dr. Jimenez's opinion was Dr. Tracy's, yes, Dr. Tracy's diagnosis, the patient's age, over 40, his elevated BMI, and a leg injury requiring a cast. What Dr. Jimenez contended were risk factors for a DVT. So I think that's very important and very telling on this record. Dr. Jimenez voiced his standard of care opinions not based exclusively on what Dr. Tracy ordered or based on an obligation of an employee to follow her employer's instructions. Plaintiff's own expert against Rezin based his opinion on medical considerations. Those medical considerations, according to Dr. Jimenez, dictated Rezin's conduct through its receptionists. Rezin Orthopedics countered with parallel expert testimony, also grounded in medicine, not on considerations of office management or administration. The defense expert, Dr. Pinsler testified, the staff scheduling of the appointments three weeks out complied with the standard of care. Like Dr. Jimenez, Dr. Pinsler had a medical reason as the basis for his standard of care opinion. Seeing the patient at three weeks, four weeks did not impact the medical care. On cross-examination, waiving the position that the defense should not be permitted to permit testimony that varies from the idea that two weeks was written in stone, Plaintiff's counsel revisited Rezin's standard of care with Dr. Pinsler. And in those exchanges, Dr. Pinsler disagreed that the standard of care obligated the receptionists to clear a difference of a week or so with a physician. So this is the case that plaintiff framed. Framed the issue as a medical issue against Dr. Rezin, or against Rezin Orthopedics, and presented expert medical testimony to the jury as the basis for the standard of care opinion. The plaintiff should not be heard to complain after an adverse verdict that the defense should have been barred from presenting like testimony. The appellate court misapprehended this Court's precedent in reaching the conclusion that it should pinpoint testimony to the exclusion of expert testimony as relevant to the standard of care. The plaintiff does not cite a single case supporting the proposition that what counsel in the appellate court and in the trial court called Dr. Tracy's standard of care eliminated the relevance of all other standard of care evidence. Plaintiff does not cite a single case holding that policies and practices dictate a J and OV in this or any remotely analogous situation. The appellate court cited cases reversing summary judgment orders. The appellate court cited cases standing for the proposition that we offer to the Court today, and that is this was a question of fact for the jury. The internal practices do not conclusively dictate that the appellate court's standard of care. The fact that in some instances physician testimony or other types of expert testimony may not be required does not mean it's excluded as irrelevant or that it must be excluded as irrelevant. And that is, in my view, the fundamental error of the appellate court on the standard of care issue, in addition to the fact that the Court did not account for any of the receptionist's testimony that that also was at variance with the Court's conclusion. So the question is pertaining to the standard of care based on whether the clinic's staff can deviate from what the doctor ordered, or is the clinic's negligence based on the same standard of care that would be applicable to Dr. Tracy? I think that the Court – I think that the way it was presented was that it was a different issue, Your Honor, and it wouldn't necessarily be the same standard of care. It's an institutional theory as opposed to professional negligence theory. But this proceeded – the jury was instructed on professional negligence. As to Dr. Tracy, and institutional negligence as to Resin. And the instruction was as to Resin, 105.03.01. And, you know, I think I'd be remiss if I didn't emphasize that as a very revealing aspect of the record. The plaintiff did not challenge on appeal the Court instructing the jury under 105.03.01 as to Resin. And that instruction specifically said to the jury, consider opinion testimony as well as testimony concerning policies and procedures. So if I can – if I – if the Court doesn't have questions for me on the standard of care, I'll address proximate cause briefly. I believe that the appellate court fundamentally erred on this issue as well. The key to the plaintiff's proximate cause theory was that at a two-week appointment, if it had occurred, Mr. Steed would have come to see Dr. Tracy. He would have a DVT at that time. It would have been diagnosable, symptomatic. It would have been treated, and it would have responded to medication. And all of those points were contested, particularly whether a DVT even existed at the time plaintiff contends Mr. Steed should have been seen. Even Dr. Jimenez conceded that a DVT can develop and present no symptoms, can form regardless of medication, can form and progress to a pulmonary embolism over a matter of hours. So on the issue of proximate cause, if there's any overwhelming conclusion to be drawn from the trial record, it is that the premise of plaintiff's causation theory was speculation. Dr. Tracy said he had no idea what Mr. Steed would have complained of. Who could? Or what Dr. Tracy would have found on March 3rd, the date that plaintiff claims Mr. Steed should have been seen again. So in addition to that, go on from there, Dr. Hummel, a pulmonary and critical care specialist, told the jury that the first sign of a clinically significant DVT was days after plaintiff claims the return appointment was required. Dr. Pinser told the jury that Dr. Jimenez only could speculate about Mr. Steed's situation on March 3rd. So there's ample testimony bearing directly on proximate causation, raising questions concerning what Dr. Tracy would have found, what he would have thought was appropriate treatment for a young man with an extremely low risk compared to other people with that type of injury, having this sort of a problem, or whether medication would have resolved the clot and prevented a pulmonary embolism. One thing for certain is that there was a question of fact for the jury. Plaintiff actually said so on page 33 of her brief, although followed that statement with a contention that the jury would have found for the plaintiff on proximate cause. But it was a jury issue, and even on that issue, independent of the standard of care issue, the appellate court's judgment should be vacated and the jury's verdict reinstated. And very briefly, on the issue of new trial, we submit that there's no reason to send the case back to the appellate court to consider the new trial issues that plaintiff raises. All of the trial issues plaintiff raises impact the standard of care. And plaintiff did not disagree with that characterization in the brief. If this Court agrees that the verdict should stand on the causation evidence, there'd simply be no basis to question whether the trial court or whether the trial should be repeated based on evidentiary issues or trial conduct that only impacted whether resin was negligent. Plaintiff in response to that argument only challenged the sufficiency of the causation evidence, but in, you know, as we have argued and as I think as the record bears out, the causation evidence was quite ample to support the jury's verdict. The issue about the plaintiff raised three issues very briefly. One was whether the Court abused its discretion in allowing the defense to present evidence on the standard of care. That is subsumed in the one of the issues the Court already is addressing, so there certainly would be no reason to go back to the appellate court to consider that. The second is whether the plaintiff could repeat hearsay to establish her theory about negligence in connection with the February 25 phone call. Plaintiff claims was mishandled. Plaintiff doesn't disagree that she was trying to prove the content of that call. Plaintiff's theory that Mr. Steek complained of a typecast in the call and that the person answering the phone said Eicher-Lagan elevated and didn't advise the physician or physician's assistant of the content. The trial judge simply followed a first decision, the Agins decision that was directly on point to bar that testimony. And again, we could, I suppose, debate it, but it pertains solely to a standard of care element, and it could not overcome the general verdict or the two-issue rule. And plaintiff doesn't address in the brief that her counsel found a way to let the jury know exactly what plaintiff's theory about that phone call was. And the last point plaintiff raised on the new trial was a brief comment during closing argument pertaining to Ms. Decker's testimony, again, an issue that only could have pertained to the standard of care. The court gave a admonishment to the jury. I don't think that there was any violation of any motion in limine or, rather, order in limine on that issue. But in any event, the court, the jury was admonished, and this was a brief matter that would not require a new trial. This Court may have taken this case out of its great respect for jury verdicts. That's one of the arguments we made in our petition, and in my estimation, perhaps the most important one. We believe that the judge correctly determined, the trial judge, that the clinic was entitled to present its side, and that the jury resolved the factual issues as the judge instructed. The appellate court erred in reaching a different conclusion, and we respectfully ask that the judgment be reversed. May I answer any questions? Thank you. Thank you, Mr. Brown. Mr. Lucas? May it please the Court. Good morning. My name is Marty Lucas, along with Lauren Levin-Budds. It's my privilege to represent Sue and Olivia Steed in this matter, and it's an honor to be here before you today. Before I start my remarks, I do want to point out one thing, because the defendant has continually accused the plaintiff of waiving the argument about the standard of care that Dr. Pinzer talked about, about four to six weeks. And I just want to point to the Court, if you look at page 3182 of the record, I clearly renewed the objection to that issue, and I was overruled, so I did not waive that at all. So that being said, I wanted to point out, I think conflation is a perfect term to use in this case, because the appellate court saw right through what the defendant tried to do at trial between the two different theories of liability. As this Court, I'm sure, knows, there was a direct theory against Dr. Tracy, within his standard of care, as to whether or not he should provide chemoprophylaxis to prevent ADVT. The second theory was very simple, which was against the group itself, which is when a doctor gives an order to his staff to set an appointment follow-up, they are obligated to follow up that and follow his order and do what he says. Very simple. Those two issues have nothing to do with each other. They are completely separate theories. But they keep trying to suggest that their expert testimony on the standard of care somehow crossed over and intermingles and is applicable to both. That's not the trial that we had. If you look carefully at the testimony, their experts don't talk about the standard of care of the staff. They're talking about the chemoprophylaxis issue. That wasn't required. That was clearly a dispute among the experts. That's why it's not before you. What's before you is simply whether or not there was any evidence to suggest that it was within the standard of care not to have Glenn Steed come back in two weeks as Dr. Tracy ordered. So contrary to what the defendant is arguing, Dr. Jimenez said they gave an order for two weeks. That was within the standard of care. And they didn't follow it. That's their obligation. There's a lot of argument here by the defense saying that we're somehow creating a higher standard of care for the staff and the group, these non-medical professionals. That's the exact opposite of what's happening here. We're saying they can't substitute their judgment. They can't make medical decisions. Their job is to take that super bill, which is where Dr. Tracy gives his order, and follow it. It's very simple. And Dr. Jimenez says that's the standard of care in an office setting. The staff has to follow what the doctor said. And why was the jury instructed to consider opinion testimony from qualified witnesses? Because the trial judge rejected our ordinary negligence instruction. But I'm not sure it really makes a difference for what the appellate court did here. Because even if we use the 105 instruction versus the ordinary care instruction, there was still overwhelming testimony that said that the staff had to follow the order as given. They didn't have any discretion. So we put out professional standard of care testimony to assist the jury. And then what did we do on top of that? Well, we added admissions from Dr. Tracy saying, yeah, they have to follow my orders. That would be my expectation. We added admissions from the staff themselves saying that, yes, we're supposed to follow his order. And what's really ironic about the defendant's position in this case is they're suggesting they keep saying a custom practice is not evidence of standard of care. That's not actually the law. What this Court has held many times is policies and procedures utilized by a hospital or an office or whatever may be indicative of the standard of care. It is not necessarily the standard of care. So we offered that testimony to the jury, and there was no dispute. Even Dr. Pinzer admitted that that was the order. They're supposed to follow it. But to suggest that somehow we're creating this new standard of care that's higher than what the doctor had doesn't make any sense. And they want to have their cake and eat it, too. Because they're saying we can't use custom practice, but at the same time they're telling you that we ignored custom practice testimony where some of the people said, well, we could go out a few days or even a week or whatever it was. The problem with that, of course, is if they're saying a professional standard of care had to apply and was appropriately applied, they never established that that personal practice, that that individual's custom practice that she may have had was the standard of care. Nobody ever said that that was appropriate. So the only testimony out there, and the appellate court saw through this, was Dr. Jimenez saying, you've got to follow the order, and the staff saying, yeah, I've got to follow the order, and Dr. Tracy saying, yeah, I expect them to follow my order. That's the testimony on the institutional negligence that was out there. And the appellate court realized there's no way any contrary verdict could stand on that issue. And they recognized that all these other opinions were just conflating the different issue and were designed to really confuse the whole issue with the jury. So the doctor's order set the standard of care for the organization. Is that correct? Yes. And if I can expand on that. So think of it this way. The defendants are saying that Dr. Pinzer says, well, you could have had the standard of care said you could have gone out as much as four to six weeks. Let's assume that's true. We disputed it, obviously, but let's assume it's true. We expect Dr. Tracy to act within the standard of care for the best interest of his client. So when he said I want him back in two weeks, he gave very explicit medical reasons why he wanted that done. Nobody comes into the courtroom and says that two-week order was against the standard of care. It was within the standard of care. So once he says this is what I want for my patient, they're obligated to follow it. They can't, again, substitute medical judgment that they have no foundation for. Wasn't there testimony that coming back three weeks, four weeks would still have been within a standard of care for this type of treatment? There was testimony of that, again, over our objection, because, again, on the institutional negligence, our point was once he says two weeks, nobody says you can go past two weeks. There's no testimony from anybody that says that's okay. And if I could add one more point, which I really find interesting, because we have amicus briefs in this case. Dr. Pinzer tried to say that every office can set its own standard of care, which means that if that's true, we can only look to what was the case here, which is you got a super bill, that's my order, you follow it. But think about how the amicus never touches upon that, the defense amicus. Think about the chaos that could happen if every place can just willy-nilly have their own standard of care when you have receptions trying to figure out, well, this injury should have a two-week, so I have a week's leeway. Or this one is four weeks, so I'll have a two-week leeway. That would be chaos and terrible for patient care. But that's not this case. It's very simple. Do as the doctor ordered. Now, that brings us, of course, to proximate cause. When Glenn Steed presents to Dr. Tracy on February 17th of 2009, he had no complaints consistent with DVT. Nevertheless, Dr. Tracy took a history to find out was there any evidence of DVT. Dr. Tracy also did a physical examination. In the record, you'll see something called a Hohmann sign, where he's pressing on the calf of the leg to see if there's a sign of a DVT. Now, he did this even though there was no indication by the patient he was having complaints that might be consistent with that. In addition to that, once he realizes there is no, at that point, sign of a DVT, he has a lengthy discussion with Mr. Steed about that issue, saying, here's the risk. We can possibly give you medication. I don't think it's necessary, but we can do this. And I will point out again that a lot of the detail about that conversation about the DVT and the potential risk was brought out on the rehabilitation questioning of Dr. Tracy by defense counsel. So they were recognizing, even before any symptoms, that DVT is a significant concern. It is foreseeable that a patient with this injury could develop a DVT, and that is a serious and ultimately can be a life-threatening issue. Counsel, the appellate court's treatment of this takes place in one paragraph, treatment of the proximate cause. The appellate court said that the decedent experienced discomfort and swelling shortly after he was submitted for the cast on February 19th. Is that conclusive proof to meet the PEDRC standard in this case? If you take that in isolation, I would say no, but I know that the appellate court clearly looked at the entire record, and the entire record was that the medical testimony was based on the complaints that were discussed at trial starting the day after the cast was placed up until the time he died. If those complaints being present, had he been seen in two weeks, it would have been diagnosable. And to your question, there really are only two people who testified at trial on that issue. One was Dr. Jimenez, who clearly stated that the DVT was there, it was diagnosable, it was treatable, and death were prevented. The other person was Dr. Tracy himself. And Dr. Tracy, when presented with the hypothetical, saying, Doctor, I know you didn't see him, but Sue Steed says he had these complaints. If you had seen him in those two weeks, would you have been in a position to diagnose that DVT and save this man's life? And he said yes. But we also have Dr. Pinzer's testimony, who talks about discomfort and swelling, and if it's somewhat alleviated by analgesics and ice and elevation, that that's not necessarily, this discomfort and swelling is not necessarily a DVT. So the issue is, was there a DVT on or before, I guess it would have been March 3rd, that would be the 14 days after Dr. Tracy saw the deceased? Right. So two things I can say to that, Justice. First, Dr. Jimenez, and I believe Dr. Hummel could have been Dr. Butcher, and I apologize for not remembering which one, as well as Dr. Tracy, all agreed that based on those complaints, and based on what we know, obviously he died from a PE, that that DVT likely occurred in the lower extremity, where the injury was, and those complaints were consistent. So again, Dr. Jimenez gives us a proximate cause. Dr. Tracy essentially gives us a proximate cause. The other expert didn't touch on it. Now, as far as Dr. Pinzer goes, this is a good example of what looks large from a distance, close up is never that big, because when you look at his testimony, he never gives a proximate cause opinion. He talks about, yes, those complaints could have meant this or meant that, that's true, but he never gives an opinion one way or the other. What he actually said was, well, if he had the DVT at the time within that two weeks and he was seen, it would have been diagnosable and treatable. If he didn't have it, it would have been diagnosable and treatable. But he doesn't give an opinion that it wasn't there. He doesn't give an opinion, if he could have, that it would have been speculative to say that it was there within that two-week time frame. He doesn't give an opinion one way or the other. And again, the appellate court recognized that. We have Dr. Jimenez and essentially Dr. Tracy kind of agreeing, yeah, if I had seen him, I could have saved him. Do you agree that the three evidentiary issues you raise all are tied, as counsel argued, are all tied to the standard of care issue and not to the proximate cause issue? No, I do not agree with that. I believe the hearsay issue would be different. Because the hearsay issue would have allowed the jury to get more information, one, about how Glenn was feeling, but also more information about the phone call that was made to resident orthopedics on the 25th. And it was a stipulation that a phone call had been made. But because of the ruling on the hearsay issue, we were not allowed to raise that issue. And on the hearsay issue, counsel made a comment about proving the content. Well, the issue with hearsay is, are you bringing it out to prove the matter asserted? That's not really what proving content means. Because the content was to show that if those statements were made, certain things would have been done. So, for example, if he had told Sue Steed, I didn't call the doctor's office, as I promised, she would have done something. If he had told, if he had gone, if that message got to the doctor, then the doctor likely would have done something in response to that. So that would have bolstered, I think, the proximate cause issue. But again, since we only have Dr. Jimenez and Dr. Tracy giving actual testimony, opinion testimony on that issue, it isn't necessary for affirming the appellate court here. I hope that answers your question, Justice. So, again, we know under the Pedrick standard that, you know, it's easy to take, cherry-pick certain things and try to make them really big. But when you look at the whole context of the case, clearly there was no justification for ignoring the doctor's orders. There was no explanation that would be within any standard of care to do that. And under the testimony that was provided, there was no contrary testimony that something other than a lower-leg DVT caused this man's death. And no contrary testimony that treatment would have prevented this tragic death. If there are... If we disagree with the appellate court on the proximate cause issue, we don't get to the standard of care. Is that true? No. I mean, I think that then you... Well, I mean, if I haven't proved one element of my prohibition case, I guess you're right. I had to think about that for a second. But, yeah, I mean, that's part of the prohibition case. I mean, we recognize that. If there are no further questions, I appreciate your time. And we ask you again to affirm the appellate court and send this matter back to the circuit court for a trial on damages. Thank you, Mr. Lucas. Thank you, Your Honor. I have to go to Justice Burke's question, and that is to address the plaintiff's comments in the context of what we are entitled to hear, which is that every presumption should be, or every bit of the evidence should be considered to determine whether the jury's verdict was supported by the testimony. On the issue of proximate cause, of course, counsel points out some testimony that he believes supported the plaintiff's But counsel is wrong when counsel says that only Dr. Tracy and Dr. Jimenez discussed proximate cause. That's not accurate. Dr. Hummel very specifically gave the opinion that the condition that the record showed that the first sign of a diagnosable DVT was on March 7th, which was after the date that Dr. Jimenez contends the patient should have been back to be seen. So that's very significant testimony. Dr. Pinzer also explained why it was very speculative to contend that the condition was present and diagnosable as of March 3rd. Dr. Tracy, and again, counsel points to some of Dr. Tracy's testimony, but very significantly, Dr. Tracy testified, he had no idea what he would have been confronted with had the patient returned on March 3rd, or what he would have recommended, or what would have been required or called for within the standard of care. Pure speculation. For counsel to argue for seeability, I think, also is contrary to the testimony. All of the experts, or at least I know Dr. Jimenez certainly conceded this point on cross-examination, and the other experts as well, established what a rare situation this was. And Dr. Hummel discussed the medical literature, and what the jury heard was there was no reported case in the English language of a PE under these circumstances. So this is a rare occurrence. This is not a foreseeability issue, and I think that one of the amicus for the defense made a very good point in challenging foreseeability. It wasn't foreseeable. You know, again, the issue of whether there could have been a diagnosis, absolutely a question of fact. Nothing about the hearsay testimony that plaintiff wanted to present had anything to do with the issue of proximate cause, and plaintiff hasn't until today argued that it does. On the standard of care issue, there was never an argument presented by the defense of some unusual or higher standard. There was never an argument by the defense that the plaintiff couldn't talk about custom and practice or policies. It's the plaintiff who is saying that the defense couldn't use expert testimony. So that argument is a little bit backwards. And certainly, and again, these were the instructions that were given to the jury. The instructions as to the way to determine residents' standard of care haven't been challenged in the appellate court or in this court. And the, you know, for the plaintiff to say it's only about whether the receptionist followed an order to schedule the appointment within that time frame. Well, there was not testimony that if it's March 3rd, it has to be March 3rd. There was testimony that took issue with that, certainly. There was testimony of Jody Decker who said that, who explained what her process was in scheduling the, a casting appointment, and that it was not required under the procedure of the clinic for her to schedule the return appointment at that time. There was testimony by Receptionist Hare that explained she could only testify based on her custom and practice, and she had no reason to believe that she had deviated from her custom and practice. So it wasn't as though there was 100 percent unanimity on that issue, or that Dr. Tracy said that there was a standard of care that was required of resident receptionists. He said what his expectation was, but it was not a standard of care opinion, and even if it were, there was contrary evidence. There was contrary evidence, there was contrary testimony by Dr. Pinzer. And under the instructions that were given to the jury, the jury considered Dr. Pinzer's testimony on that point. And so, you know, for the plaintiff to say, well, this was our theory, and there was some evidence that supported it, so the rest of it should be disregarded, that's just not Illinois law. And the plaintiff can have a theory of negligence, and the defense can say, well, even if that occurred, we don't agree that's negligent. And that's our position. And we think that the jury's verdict should be reinstated. If I can't answer any questions, I'll thank the Court. Thank you. Case number 125150, Susan Steed v. Resident Orthopedics and Sports Medicine, will be taken under advisory under known as Agenda Number 8. I want to thank Mr. Grand and Mr. Lucas for your arguments this morning.